MORBARK INDUSTRIES, INC v WESTERN EMPLOYERS
INSURANCE COMPANY

MORBARK INDUSTRIES, INC v FIRST STATE INSURANCE
COMPANY

Docket Nos. 98451, 98452. Submitted April 19, 1988, at Grand Rapids.
    Decided August 15, 1988. Leave to appeal applied for.

Morbark Industries, Inc., a Michigan manufacturing company,
    obtained umbrella or excess liability insurance policies for
    successive periods of coverage from Western Employers Insur-
    ance Company, a California insurer, and First State Insurance
    Company, a Massachusetts insurer. Coverage under both poli-
    cies extended to liability claims in excess of Morbark's coverage
    for $1,000,000 under general liability policies issued by insurers
    other than Western Employers or First State. Products liability
    suits were brought against Morbark in each of the periods of
    coverage by Western Employers and First State. However, the
    insurers under the general liability policies had become insol-
    vent and Morbark demanded that Western Employers and
    First State provide coverage and defend the lawsuits. Both
    Western Employers and First State denied liability for payment
    of claims unless the claims exceeded the $1,000,000 limit of the
    underlying general liability policies. Morbark commenced sepa-
    rate actions in the Isabella Circuit Court against Western
    Employers and First State. On a record of facts stipulated to by
    the parties, the trial court, Paul F. O'Connell, J., issued judg-
    ments in favor of defendants. Plaintiff appealed from the
    judgment in each case.

    The Court of Appeals consolidated the appeals and *held:*

    1. The umbrella policies at issue, when read in their entirety,
    are unambiguous in providing that coverage only extends to
    claims over and above those covered under the primary general
    liability policies and that such excess coverage is not intended

REFERENCES

Am Jur 2d, Insurance §§ 1784, 1789, 1791.

Validity, construction, and effect of statute establishing compensa-
    tion for claims not paid because of insurer's insolvency. 30
    ALR4th 1110.

to provide primary insurance in the event of the insolvency of the primary insurer.

2. The Western Employers policy was intended by plaintiff and Western Employers to have been made under Michigan law. Thus, California case law, which includes a case in which a policy similar to Western Employers was construed to be ambiguous and coverage under the umbrella policy was provided to the insured when the primary insurer became insolvent, does not apply to the Western Employers policy in this case.

3. The First State policy was intended by plaintiff and First State to have been made under Massachusetts law. Massachusetts precedents construing insurance contracts are essentially the same as those of Michigan. Two recent Massachusetts decisions cited by plaintiff, in which ambiguities found in umbrella policies were construed to provide coverage where the primary insurers were insolvent, involved policies whose language was not similar to that in the First State policy and are, therefore, distinguishable and inapplicable.

Affirmed.

INSURANCE — UMBRELLA OR EXCESS LIABILITY INSURANCE POLICIES — INSOLVENCY OF PRIMARY INSURER.

Generally, coverage under an umbrella or excess liability insurance policy only extends to claims over and above those covered by the primary general liability policy and is not intended to provide primary insurance in the event of the insolvency of the primary insurer.

*Warner, Norcross & Judd* (by *Roger M. Clark* and *Steven J. Vander Ark*), for Morbark Industries, Inc.

*Foster, Meadows & Ballard, P.C.* (by *Robert N. Dunn* and *Camille A. Raffa*), and *Tribler & Marwedel, P.C.* (by *Robert N. Dunn*), for Western Employers Insurance Company.

*Varnum, Riddering, Schmidt & Howlett* (by *Charles M. Denton* and *Donald P. Lawless*), for First State Insurance Company.

Before: WEAVER, P.J., and McDONALD and W. R. PETERSON,* JJ.

W. R. PETERSON, J. The parties submitted these cases to the trial court on agreed statements of fact and motions for summary disposition. Plaintiff appeals as of right from the resulting final judgments in favor of the defendants.

Plaintiff is a Michigan manufacturer which purchased an umbrella, or excess, liability insurance policy from defendant First State Insurance Company for the period October 1, 1982, to October 1, 1983, which insurance was designed to insure against liability claims in excess of the $1,000,000 coverage provided by an underlying general liability insurance policy with Ambassador Insurance Company. For the period October 1, 1983, to October 1, 1984, plaintiff purchased a similar umbrella policy from Western Employers Insurance Company with $1,000,000 underlying general liability insurance provided by Union Indemnity Insurance Company of New York.

Products liability suits have been commenced against plaintiff for alleged causes of action arising during the terms of each of the insurance policies. Each of the general liability carriers became insolvent and were ordered into court-supervised liquidation. Plaintiff made demand on both defendants for coverage and that they assume defense in the pending actions.[1] Each defendant refused to assume the defense of the pending actions and denied liability for payment of claims until they exceeded the $1,000,000 upper limit of the under-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] It is conceded that, if there is no coverage for liability claims, there is no duty on the part of defendants to assume the defense against such claims.

lying general liability policies. These actions resulted.

Plaintiff's claim is that the umbrella coverage is not for liability in excess of the amount of $1,000,000 but rather for liability in excess of whatever amount may be recoverable from the carrier of the underlying $1,000,000 general liability insurance, e.g., if the general liability carrier becomes insolvent, the lower limit of the excess coverage "drops down" from $1,000,000 to whatever amount can be recovered from the insolvent general liability carrier. Plaintiff in reality seeks to make the umbrella carrier an insurer not only against the liabilities described in the contract but also of the solvency of the general insurance carrier.

Defendants, in turn, argue that the umbrella insurance provides coverage for liability in excess of $1,000,000. Had their policies said that and no more in describing the intended coverage, plaintiff clearly would have no claim. The insuring agreements of the policies may have once had "plain English" origins, simply defining the coverage in that way, but evolution through generations of legal usage have rendered the present insuring agreements prolix. The translation, however, is the same, for the coverage is still defined as being for an excess over an *amount,* which amount is elsewhere identified as $1,000,000. The insuring agreement of the First State policy, for instance,[2] provides:

I. COVERAGE
To indemnify the INSURED for ULTIMATE NET LOSS, as defined hereinafter, in excess of RETAINED LIMIT, as herein stated. . . .

* * *

---

[2] The language of the Western Employers policy is the same in all material respects.

II. UNDERLYING LIMIT—RETAINED LIMIT

The Company shall be liable only for the ULTI-MATE NET LOSS in excess of the greater of the INSURED'S:

A. UNDERLYING LIMIT—an *amount equal to the limits of liability indicated beside the underlying insurance* listed in the Schedule A of underlying insurance[3] . . . ; or,

B. RETAINED LIMIT—*The amount specified* in Item 3 I B of the declarations as the result of any one occurrence not covered by said underlying insurance, and which shall be borne by the IN-SURED.[4] [Emphasis added.]

These provisions of the policy thus state the threshold of liability level thereof as an amount which is the policy limit of the underlying general liability insurance, $1,000,000.

Plaintiff contends, however, that this language is inconsistent with the language contained in the declarations page of the policies which speaks of the limits of liability as follows:

[Western Employers policy] Limits of Liability: The limit of the Company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.

A. $10,000,000. Single Limit any one occurrence combined Personal Injury, Property Damage and Advertising Injury or Damage in excess of:

(1) UNDERLYING LIMIT

The *amount recoverable* under the underlying insurance as set out in the Schedule of Underlying Insurance attached or

(2) RETAINED LIMIT

$10,000. Ultimate Net Loss as the result of any

---

[3] In Schedule A of each policy the limits of liability indicated beside the underlying insurance listed is $1,000,000.

[4] The retained limit in each case for which the insured is responsible is $10,000.

one occurrence not covered by said underlying insurance.

B. $10,000,000. Limit in the aggregate for each annual period with respect to:

(1) The Products Hazard or Completed Operations Hazard or both combined, or

(2) Occupational Disease sustained by employees of the insured. [Emphasis added.]

Plaintiff contends that this definition of the underlying limit in the declarations, unlike the language in the insuring agreement, does not indicate a set and specific amount; rather, plaintiff claims, the "amount recoverable" speaks to the ability of the primary carrier to pay out the limits of its policy, thereby defining the underlying limit as a variable amount, the policy limit of the underlying insurance or whatever amount is recoverable thereunder. Given this conflict between the language in the insuring agreement and the declarations, plaintiff argues, there is an ambiguity which, under accepted principles of insurance law, must be construed in favor of the insured.[5]

The trial judge herein rejected that argument, pointing out that the language in the declarations to which plaintiff points begins: "The limit of the Company's liability shall be as stated herein, *subject to all of the terms of this policy having reference thereto.*" (Emphasis added.) We agree with this conclusion that the policies, read as a whole, are unambiguous.

The financial vicissitudes of the insurance industry in recent years have spawned numerous similar cases, though this is the first of its genre in Michigan. Though there have been some differences in the language of the various insurance contracts construed in such cases, the result in

---

[5] *Royal Globe Ins Cos v Frankenmuth Mutual Ins Co,* 419 Mich 565, 573; 357 NW2d 652 (1984); *Gorham v Peerless Life Ins Co,* 368 Mich 335; 118 NW2d 306 (1962).

most jurisdictions has been to reject the so-called "drop down" theory.[6] That accords with the recognized intent of the parties, the purpose of the umbrella coverage being to provide, at a relatively low premium, extended coverage up to high limits, over and above primary insurance coverage. 8A Appelman, Insurance Law & Practice, § 4909.85, pp 452-457. No one has seriously contended that such inexpensive excess coverage was intended by the parties to provide primary insurance, as well, in the event of the insolvency of the primary carrier. In *Continental Marble & Granite Co, Inc v Canal Ins Co*, 785 F2d 1258, 1259 (CA 5, 1986), the Court said:

We therefore look to the possible consequences

---

[6] See, e.g., *Golden Isles Hospitals, Inc v Continental Casualty Co*, 327 So 2d 789 (Fla App, 1976); *US Fire Ins Co, Inc v Capital Ford Truck Sales, Inc*, 257 Ga 77; 355 SE2d 428 (1987); *Thomson National Press Co v National Union Fire Ins Co*, 16 Mass App 242; 451 NE2d 432 (1983); *St Vincent's Hospital & Medical Center v Ins Co of North America*, 117 Misc 2d 665; 457 NYS2d 670 (1982); *Prince Carpentry, Inc v Cosmopolitan Mutual Ins Co*, 124 Misc 2d 919; 479 NYS2d 284 (1984); *Pergament Distributors, Inc v Old Republic Ins Co*, 128 AD2d 760; 513 NYS2d 467 (1987); *Value City, Inc v Integrity Ins Co*, 30 Ohio App 3d 274; 508 NE2d 184 (1986); *Wurth v Ideal Mutual Ins Co*, 34 Ohio App 3d 325; 518 NE2d 607 (1987); *McNeal v First State Ins Co*, an unpublished 1987 opinion of the Third Circuit, see 822 F2d 53; *Molina v United States Fire Ins Co*, 574 F2d 1176 (CA 4, 1978); *Fried v The North River Ins Co*, 710 F2d 1022 (CA 4, 1983); *Continental Marble & Granite Co, Inc v Canal Ins Co*, 785 F2d 1258 (CA 5, 1986); *Duke Transportation, Inc v Mission National Ins Co*, 792 F2d 550 (CA 5, 1986); *Zurich Ins Co v The Heil Co*, 815 F2d 1122 (CA 7, 1987); *Wright v Newman*, 767 F2d 460 (CA 8, 1985); *St Paul Fire & Marine Ins Co v The Medical Protective Co*, 691 F2d 468 (CA 10, 1982); *Garmany v Mission Ins Co*, 785 F2d 941 (CA 11, 1986); *Guaranty National Ins Co v Bayside Resort, Inc*, 635 F Supp 1456 (D VI, 1986); *Holland v Stanley Scrubbing Well Service*, 666 F Supp 898 (WD La, 1987); *Radiator Specialty Co v First State Ins Co*, 651 F Supp 439 (WD NC, 1987), aff'd 836 F2d 193 (CA 4, 1987).

Contra, *Reserve Ins Co v Pisciotta*, 30 Cal 3d 800; 180 Cal Rptr 628; 640 P2d 764 (1982); *Gros v Houston Fire & Casualty Ins Co*, 195 So 2d 674 (La App, 1967); *MacNeal v Interstate Fire & Casualty*, 132 Ill App 3d 564; 477 NE2d 1322 (1985); *Massachusetts Insurers Insolvency Fund v Continental Casualty Co*, 399 Mass 598; 506 NE2d 118 (1987); *Gulezian v Lincoln Ins Co*, 399 Mass 606; 506 NE2d 123 (1987).

of the rule Continental Marble propounds. Impos-
ing the duty of indemnification on Canal would, in
effect, transmogrify the policy into one guarantee-
ing the solvency of whatever primary insurer the
insured might choose. See *Golden Isles Hospitals,
Inc v Continental Casualty Co,* 327 So 2d 789, 790
(Fla App, 1976). An excess liability insurer obvi-
ously does not anticipate this heavy onus:

"Excess or secondary coverage is coverage
whereby, under the terms of the policy, liability
attaches only after a predetermined amount of
primary coverage has been exhausted. A second
insurer thus greatly reduces his risk of loss. This
reduced risk is reflected in the cost of the policy."

*Whitehead v Fleet Towing Co,* 110 Ill App 3d
758; 66 Ill Dec 449; 442 NE2d 1362, 1366 (1982).
Continental Marble's proposed rule would require
insurance companies to scrutinize one another's
financial well-being before issuing secondary poli-
cies. The insurance world is complex enough; to
impose this additional burden on companies such
as Canal would only further our legal system's
lamentable trend of complicating commercial rela-
tionships and transactions.

Where a contrary result has been reached, it has
been predicated upon the presence of language in
the policy from which, the court has found, a
policyholder might draw a reasonable expectation
of coverage, contrary to other language in the
policy denying coverage, thereby creating an ambi-
guity which is resolved in favor of the insured.[7]
This is plaintiff's theory. To reach that result,

---

[7] *Reserve Ins Co v Pisciotta, Gross v Houston Fire & Casualty Ins
Co, MacNeal v Interstate Fire & Casualty, Massachusetts Insurers
Insolvency Fund v Continental Casualty Co,* and *Gulezian v Lincoln
Ins Co, supra,* n 5.

We note that plaintiff contends that *Geerdes v St Paul Fire &
Marine Ins Co,* 128 Mich App 730; 341 NW2d 195 (1983), is among the
cases reaching a "drop down" result. *Geerdes,* however, involved quite
a different question, how to compute the underlying limit when no
coverage is provided by the underlying insurance but other unsched-
uled insurance did provide coverage.

however, one may not simply pick particular language from the contract to claim either a reasonable expectation of coverage or ambiguity. While, as noted above, it is hornbook law that ambiguities in insurance contracts are to be resolved in favor of the insured, it is also hornbook law that contracts, of insurance and otherwise, are to be read as a whole to determine the intent of the parties. *Royal Globe Ins Cos v Frankenmuth Mutual Ins Co*, 419 Mich 565; 357 NW2d 652 (1984). As the Court noted in *Raska v Farm Bureau Mutual Ins Co*, 412 Mich 355, 362; 314 NW2d 440 (1982):

> A contract is said to be ambiguous when its words may reasonably be understood in different ways.
> If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage.
> Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.

As noted above, we find the insuring agreement of the contract herein to clearly provide coverage in excess of a stated amount, the amount "indicated beside the underlying insurance listed . . . ." Other provisions of the policies are to the same effect, e.g.:

> [First State policy] CONDITIONS:
>
>        * * *
>
> G. . . . Coverage under this policy shall not apply *unless and until the* INSURED, *or the* IN-

sured's underlying insurer, shall be obligated to pay the amount of the UNDERLYING LIMIT or REATINED LIMIT . . . .

*  *  *

I. . . . If underlying insurance applicable in any one OCCURRENCE is exhausted *by payment of judgment or settlement* on behalf of the INSURED, the COMPANY shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the INSURED resulting from the same occurrence . . . .

*  *  *

O. . . . It is warranted by the INSURED that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy, *except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of OCCURRENCES happening during the period of this policy.* In the event of failure of the INSURED so to maintain such policy(ies) in force, the Insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force."[8] [Emphasis added.]

From the use of the disjunctive "or" in condition G, it is clear that there is no coverage until the full amount of the underlying limit has been reached by casualty occurrences resulting in the obligation of either the insured or the underlying carrier to pay the same. *Radiator Specialty v First*

[8] The language of Condition O in the Western Employers policy militates even more strongly against plaintiff's argument, reading as follows:

In the event of failure by the insured to maintain such policy(ies) in force *for any reason, including but not limited to bankruptcy of the insured or any underlying insurer,* the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force. [Emphasis added.]

*State Ins Co,* 651 F Supp 439, 442 (WD NC, 1987), aff'd 836 F2d 193 (CA 4, 1987).

Conditions I and O reinforce the insuring agreements by making it clear that the obligations of the excess carrier are triggered only by *occurrences* as a result of which the underlying insurance is exhausted by payment of judgment or settlement. Insolvency is neither an "occurrence" within the meaning of the policy nor is the resultant uncollectibility of the underlying policy an exhaustion thereof by payment or settlement. *United States Fire Ins Co, Inc v Capital Ford Truck Sales, Inc,* 257 Ga 77; 355 SE2d 428 (1987); *Value City, Inc v Integrity Ins Co,* 30 Ohio App 3d 274; 508 NE2d 184 (1986); *Molina v United States Fire Ins Co,* 574 F2d 1176 (CA 4, 1978).

In addition, in the First State policy, the applicable casualty endorsement (FF 6) reads as follows:

It is agreed that this policy shall not apply to any liability for personal injury or property damages arising out of products or completed operations as defined in this policy, *unless such liability is covered by valid and collectible underlying insurance* as described in the schedule of underlying insurance, and then only for such hazards for which coverage is afforded under said underlying insurance. [Emphasis added.]

The general rule, in Michigan as elsewhere, is that, if there is an ambiguity such that all parts of the contract cannot be harmonized, the language of the policy endorsement or rider controls. *Peterson v Zurich Ins Co,* 57 Mich App 385, 392; 225 NW2d 776 (1975). All of the language of the policies proper, and of endorsement FF 6 of the First State policy, is consistent with the language of the insuring agreements, and the language of the declarations pages in speaking of the limits of

liability expressly provides that it is "subject to all the terms of this policy." Looking at the policies as a whole, therefore, we agree with the trial court and the majority of other courts addressing similar claims that there is no ambiguity therein.

Among the jurisdictions arriving at a different result is California. *Reserve Ins Co v Pisciotta*, 30 Cal 3d 800; 180 Cal Rptr 628; 640 P2d 764 (1982), involved an umbrella policy with language in the declarations similar to that in the instant case. The California Supreme Court found that "amount recoverable" could be construed in two different ways, i.e., either as the dollar limits theoretically recoverable under the primary policy, or as the dollar amount actually paid by the primary carrier. Finding the meaning ambiguous, the California court held that the policy had to be construed in favor of the insured. The risk of insolvency of the primary carrier, therefore, was within the scope of the excess policy coverage.[9] While we would disagree with the reasoning of the California court in finding an ambiguity from the declarations language alone without attempting to construe the contract as a whole, we would be obliged to follow that precedent as to the Western Employers contract if it is governed by the law of Western Employers' home state, California, as plaintiff contends.[10]

The parties agree that the place of making the

---

[9] In so holding, the court in *Pisciotta* based its decision on the wording of the policy and repudiated the seemingly unqualified statement of an earlier decision, *McConnell v Underwriters at Lloyds*, 56 Cal 2d 637; 16 Cal Rptr 362; 365 P2d 418 (1961), that "insolvency of a primary insurer gives rise to liability under the excess policy." To like effect, see *Fageol Truck & Coach Co v Pacific Indemnity Co*, 18 Cal 2d 748; 117 P2d 669 (1941).

[10] California insurance policies are governed not only by the statutory law but by the decisional law of that state in effect at the time of issuance of the policy. *Interinsurance Exchange of the Automobile Club of Southern California v Ohio Casualty Ins Co*, 58 Cal 2d 142; 23 Cal Rptr 592; 373 P2d 640 (1962).

contract determines the applicable law as between the states, and that the contract is deemed to have been made in the state where the last act necessary to make it a binding agreement took place. *Ohio v Eubank,* 295 Mich 230; 294 NW 166 (1940). There are no Michigan cases defining the last act necessary to complete an insurance contract, but a federal case applying Michigan law held that, where an insurance policy provides, as do the policies herein, that the policy shall not be valid until countersigned, countersigning is the last act and the place of countersigning is the place where the contract was made. *Chrysler Corp v Ins Co of North America,* 328 F Supp 445 (ED Mich, 1971). And see 43 Am Jur 2d, Insurance, § 323, p 396.

The Western Employers policy provided that it was not valid unless countersigned by an authorized representative. As is typical, there is no place for a countersignature on the body of the policy but only on the attached declarations page and the endorsements. Neither the declarations page nor the five endorsements attached at issuance were countersigned,[11] yet the parties stipulated that there was a valid contract. Endorsement 5, which was not countersigned, was a countersignature endorsement reading as follows:

> It is agreed that the signature appearing on this endorsement is the signature of a person duly authorized to countersign on behalf of the Company in the state designated above and which is appended hereto in conformity with the insurance laws of that state.

Despite the lack of a countersignature on the countersignature endorsement, the trial judge

---

[11] There were later endorsements altering the coverage of the original contract which were countersigned.

found that the parties intended that the counter-signature endorsement be a part of the agreement and that, therefore the parties intended the contract to be a Michigan contract. Neither party has discussed the reason for the countersignature endorsement but the language thereof saying that it "is appended . . . in conformity with the insurance laws of that state" suggests that Michigan law requires such an endorsement. Such a requirement does exist in some states to assure that the law of such states would govern contracts of insurance entered into by the citizens thereof. That was once the law in Michigan. 1945 PA 223 required that contracts of insurance by foreign insurers doing business to Michigan had to be countersigned by their Michigan resident agents. Although that requirement was deleted by 1972 PA 133, the endorsement conforming to the former statute could only have been intended to meet that former statutory purpose. The Western Employers contract, therefore, is a Michigan contract, construed as we have construed it above and not according to California precedents.

The First State contract was countersigned in Massachusetts and the parties agree that the law of that state is controlling. Massachusetts precedents construing insurance contracts are essentially the same as those of Michigan.[12]

Two recent Massachusetts cases found ambiguity in umbrella policies and held that the coverage of the excess carriers dropped down to provide pri-

---

[12] "Policies of insurance, like all other contracts, must be reasonably construed by giving to the words contained therein their usual and ordinary significance . . . *and by construing the various portions of the policy as parts of a single contract of insurance without according undue emphasis to any particular part over another;* but if the terms of the policy are ambiguous then every doubt is to be resolved against the insurer." *Woogmaster v Liverpool & London & Globe Ins Co, Ltd,* 312 Mass 479, 481; 45 NE2d 394 (1942) (emphasis added).

mary coverage when the carrier of the underlying coverage becomes insolvent. *Massachusetts Insurers Insolvency Fund v Continental Casualty Co,* 399 Mass 598; 506 NE2d 118 (1987); *Gulezian v Lincoln Ins Co,* 399 Mass 606; 506 NE2d 123 (1987). Because of the particular language of the policies there involved, called peculiar by the Massachusetts court, the cases are distinguishable and inapplicable to the First State policy herein. Both involved language not found in the First State policy and did not have language found in the First State policy.

In *Gulezian,* Section III of the insuring agreements spoke of "applicable limits" of liability of the underlying insurance. In the unusual structure of Section III, the Court found that "applicable" was synonymous with "collectible." The *Gulezian* court's interpretation of "applicable" as "collectible" was reinforced by the "Other Insurance" condition, which said:

> "The insurance afforded by this Policy shall be excess insurance over any other valid and *collectible* insurance available to the Insured . . . ." [399 Mass 611. Emphasis in original.]

The First State policy does not use the word "collectible" in its conditions, nor does the insuring agreement therein use the adjective "applicable" in describing the limits of the underlying insurance, so the rationale of *Gulezian* defining the same in terms of collectibility does not exist here.

In *Continental Casualty,* the policy provided:

> [I]f the applicable limit of the underlying insurance is less than as stated in the schedule of underlying insurance *because the aggregate limit of liability of the underlying insurance has been*

*reduced, this policy becomes excess of such re-duced limit of liability.* [399 Mass 600, n 3. Emphasis added.]

The court said of this language that "an excess policy that says *without limitation* that it drops down when the underlying coverage is reduced provides first dollar coverage when the primary insurer becomes insolvent." 399 Mass 601. (Emphasis added.) Unlike the Continental Casualty policy, the comparable provision of the First State policy has an express limitation, speaking of reduction in the aggregate limits of the underlying policy "solely by payment of claims." Reduction by any other cause, including insolvency of the underlying carrier, is clearly excluded.

*Gulezian* and *Continental Casualty* are thus inapplicable to the First State policy. We note that *McNeal v First State Ins Co,* an unpublished 1987 opinion of the Third Circuit, see 822 F2d 53, dealt with a First State policy identical to that here involved and, in applying Massachusetts law, distinguished both *Gulezian* and *Continental Casualty* to construe the policy as we have. We think that *McNeal* is an accurate application of Massachusetts law.

Affirmed.